UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NUMBER:  6:14-cv-622-ACC-TBS

ISAIAH MONTANEZ,

       Plaintiff,

vs.

THE CITY OF ORLANDO, a
municipal corporation; Orlando
Police OFFICER JAMES PARKER,
Badge No. 4997 in his
individual Capacity and
Defendant K9 JOKER in his
official capacity as a canine
officer in the care of
OFFICER JAMES PARKER,

       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - -

Altamonte Springs, Florida

November 4, 2014

1:01 p.m.


DEPOSITION OF:

JAMES PARKER


Marge Raeder Court Reporter, Inc.
999 Douglas Avenue/Suite 3307
Altamonte Springs, FL 32714
407/774-6611

2

1  A P P E A R A N C E S:

2      BRADLEY N. LAURENT, ESQUIRE
       Law Offices of Haynes and Laurent, P.A.
3      5401 South Kirkman Road
       Suite 620
4      Orlando, Florida 32819

5          Appearing on behalf of the Plaintiff.

6      AUSTIN L. MOORE, ESQUIRE
       Legal Affairs
7      400 South Orange Avenue
       3rd Floor
8      Orlando, Florida 32802

9          Appearing on behalf of the Defendants.

10                  - - - - -

11              I N D E X

12  TESTIMONY OF JAMES PARKER:

13      Direct Examination by Mr. Laurent          3
        Cross Examination by Mr. Moore             33
14      Redirect Examination by Mr. Laurent        35

15  CERTIFICATE OF REPORTER                        40

16  SUBSCRIPTION OF DEPONENT                       41

17

18

19

20

21

22

23

24

25

**Marge Raeder Court Reporter, Inc.**
**999 Douglas Ave/Suite 3307**
**Altamonte Springs, FL 32714**
**407/774-6611**

1          The deposition of JAMES PARKER was

2     taken on behalf of the Plaintiff on

3     Tuesday, November 4, 2014, beginning at

4     1:01 p.m., at Marge Raeder Court

5     Reporter, Inc., 999 Douglas Avenue,

6     Suite 3307, Altamonte Springs, Florida,

7     before Lorenda Kay Williams, Electronic

8     Reporter and Notary Public, State of

9     Florida at Large.

10                    - - - -

11  Whereupon,

12                 JAMES PARKER,

13  having been first duly sworn by the reporter, testified

14  as follows:

15                 DIRECT EXAMINATION

16  BY MR. LAURENT:

17      Q    All right.  Please state your name for the

18  record.

19      A    I am Sergeant James Parker.

20      Q    And where are you currently employed?

21      A    The City of Orlando Police Department.

22      Q    And how long have you been employed with the

23  Orlando Police Department?

24      A    23-and-a-half years.

25      Q    All right.  And have you worked for any other

4

1    law enforcement agency?

2         A    No.

3         Q    And do you know who Isaiah Montanez is?

4         A    I don't know him personally but I do know who

5    he is.

6         Q    And how do you know Mr. Montanez?

7         A    As a result of an arrest.

8         Q    And do you recall when that arrest occurred?

9         A    The exact date, no.

10        Q    Does March 2013 sound familiar?

11        A    It does.

12        Q    Okay.  And how did you come into contact with

13   Mr. Montanez?

14        A    It was during --

15             MR. MOORE:  I'm just going to object to the

16        form.  You can answer.

17             MR. LAURENT:  Um-hum.

18             THE WITNESS:  It was during a search and I

19        saw him riding a bicycle along with somebody else

20        riding a bicycle.  They were riding towards me and

21        I asked them to stop.

22   BY MR. LAURENT:

23        Q    And you said you were conducting a search.

24        A    Yes.

25        Q    For what?

5

1    A    For a robbery suspect.

2    Q    And was a description of the suspect given?

3    A    Yes.

4    Q    What was the description?

5    A    I don't remember the exact description.  I'd

6  have to look at my affidavit to see that.

7    Q    Okay.  I do have it here if you want to take

8  a look at it.

9    A    Please.

10   Q    [Handing]

11   A    Thanks.  [Examining]  It says there was a

12 white Hispanic male, about five-six, wearing a white

13 shirt with dark pants.

14   Q    Okay.  And in that report, does it describe

15 whether or not they were multiple suspects?

16   A    It does not.

17   Q    And does it state whether the suspect was on

18 a bicycle or not?

19   A    It does not.  At the time of the initial

20 robbery, no.

21   Q    Okay.  And you said that you were looking for

22 a suspect that was involved in a robbery and you saw

23 Isaiah Montanez and somebody else on a bicycle?

24   A    Correct.

25   Q    And what happened after you saw them?

6

A    It was dark.  The road that we were on was a
dark road.  Very -- there are street lights but all of
the trees had overgrown it, so it was very dark.

Q    Um-hum.

A    I see them riding their bicycles.  They're
riding towards myself and another officer.

     As they're riding towards me.  It's dark, as
I said, I took my flashlight.  I'm wearing the uniform
you see me wearing now.

     I lit myself up with the flashlight, so they
could see who I am and lit up the other officer as
well.

     I also had my police dog, "Joker", with me at
the time and he was on a leash.

     And as they got closer to me, I shined the
light on them and told them to stop:  Police.  Stop.
Police.  Stop.

     One of the guys stopped on the bicycle.  Mr.
Montanez continued to ride and he started riding
towards us.

     He was riding between -- going to ride
between myself and the other officer, so I reached out
and grabbed him and pulled him off the bicycle.

Q    And were they riding on a path?

A    They were on the road.

**Marge Raeder Court Reporter, Inc.**
**999 Douglas Ave/Suite 3307**
**Altamonte Springs, FL 32714**
**407/774-6611**

7

1    Q    They were on the road?

2    A    Yes.

3    Q    Okay.  And where were you standing?

4    A    I was in the road.

5    Q    And your partner was in the road as well?

6    A    When you --

7         MR. MOORE:  Object to form.  You can answer.

8         THE WITNESS:  When you say partner, are you

9    talking about the dog or the --

10        MR. LAURENT:  No.  The other officer that was

11   with you.

12        THE WITNESS:  He was a little to my right and

13   I could not see exactly where he was.

14   BY MR. LAURENT:

15   Q    Okay.  And then as Mr. Montanez approached,

16   what happened?

17   A    I reached out and grabbed him.

18   Q    Okay.

19   A    And he fell off the bicycle.  When I reached

20   out and grabbed him, I grabbed my dog on the -- by the

21   harness and I lifted him up off the ground so that he

22   wouldn't bite Mr. Montanez.

23        When we fell to the ground, I fell on top of

24   Mr. Montanez.  The dog was right there and he bit Mr.

25   Montanez.

1    Q    Okay.  And how did you grab Mr. Montanez off

2  the bike?

3    A    I reached out with my arm.

4    Q    Okay.

5    A    Like --

6    Q    So --

7    A    Like a hug if you want to call it that.

8    Q    Okay.  Not like a -- you didn't yoke him?

9    A    Well, he was riding --

10    MR. MOORE:  Object to form.  You can answer.

11    THE WITNESS:  He was riding a bicycle.  He

12  was a moving person on a bicycle.  I was

13  stationary.

14    MR. LAURENT:  Okay.

15    THE WITNESS:  So there was a yoke.

16  BY MR. LAURENT:

17    Q    All right.  And what happened after you yoked

18  Mr. Montanez and he was on the ground and you were on

19  top of him, you said your dog bit him; correct?

20    A    Yes.

21    Q    And what happened after that?

22    A    Well, I had the dog release the bite and the

23  other officer handcuffed him.

24    Q    Okay.  And did you continue your

25  investigation as to whether he was the robbery suspect?

1        A     We did.

2        Q     And what was the conclusion of that?

3        A     It was determined that he was not.

4        Q     And how was it determined that he was not?

5        A     They had the victim come by and say that that

6   was not the person that was involved.

7        Q     Okay.  And prior to you yoking Mr. Montanez

8   off the bike, what led you to believe that he was the

9   suspect?

10       A     Well, he looked like a white Hispanic male.

11  And he -- well, of course, he was riding a bicycle.

12  That's why I assumed he could have been involved.

13            There was nobody else on the road.  There was

14  nobody else that I encountered during that time.

15       Q     And -- but the victim didn't say that the

16  suspect was riding a bike; correct?

17            MR. MOORE:  Object to the form.  Predicate.

18       You can answer.

19            THE WITNESS:  No.  But it's not uncommon for

20       people who do a robbery get in their car drive

21       away.  Do a robbery get on a bicycle and drive

22       away.  Do a robbery get on a moped and drive away.

23  BY MR. LAURENT:

24       Q     Okay.  And other than Mr. Montanez being a

25  white Hispanic male, was there anything else that fit

1    the description that the victim gave you?

2       A   Well, he had white stripes on his shirt, but

3    it wasn't a white shirt.

4       Q   Okay.  And the -- what was the -- strike

5    that.

6       Did the victim tell you that the suspect had

7    on a white shirt?

8       MR. MOORE:  Object to form.  You can answer.

9       THE WITNESS:  Yes.

10   BY MR. LAURENT:

11       Q   Okay.

12       THE REPORTER:  Mr. Laurent, may I have a

13    moment, please?

14       MR. LAURENT:  Yes.

15       [Whereupon, a recess was taken, after which

16    the following transpired:]

17       THE REPORTER:  We're back on the record.

18       MR. LAURENT:  All right.  My question where I

19    left off.  Let me figure out here.

20       MR. MOORE:  I believe you said, I have no

21    more questions.

22       MR. LAURENT:  Yeah.  I did?

23       [Laughter]

24   BY MR. LAURENT:

25       Q   All right.  I think you stated that Mr.

1  Montanez, it was discovered that he was not the -- Mr.

2  Montanez was not the suspect you all were looking for;

3  correct?

4      A    That is correct.

5      Q  All right.  And after it was discovered that

6  Mr. Montanez was not the suspect, why wasn't he

7  released?

8          MR. MOORE:  I'm going to object to the form.

9      You can answer.

10          THE WITNESS:  He was under arrest because he

11      didn't stop when he was told to stop.

12  BY MR. LAURENT:

13      Q   And he was still placed under arrest for

14  resisting without violence because he didn't stop when

15  he was told to stop.

16      A   [Nods head affirmatively]

17      Q   Even though he had not committed any crimes

18  prior to you telling him to stop?

19          MR. MOORE:  Object to form.  You can answer.

20          THE WITNESS:  We were conducting an

21      investigation.  And as I mentioned earlier, it was

22      very dark outside.

23          We had the -- I wanted to stop him to make

24      sure that he wasn't involved.  And it turned out

25      that he didn't want to stop although his friend

1    that was with him stopped.

2          And he tried to ride between myself and the

3    other officer.

4  BY MR. LAURENT:

5      Q    And where did you receive your law

6  enforcement training at?

7      A    Gosh, it's changed names.  Mid Florida

8  Technical Institute.  Back -- it was way back in the

9  day.

10     Q    And after you received your training at Mid

11  Florida Technical Institute, did you receive any

12  training from the Orlando Police Department?

13     A    Yes.  We do continuous training with the

14  police department.

15     Q    And what about when you were first hired?

16     A    What do you mean?  I don't understand your

17  question.

18     Q    When you were first hired by the Orlando

19  Police Department, did you receive training from them?

20     A    Yes.

21     Q    Okay.  And were you initially hired as a K-9

22  officer?

23     A    What do you mean by initially hired as a K-9

24  officer?  You're --

25     Q    When you were first hired by the Orlando

1   Police Department, were you hired as a K-9 officer?

2       A    No.

3       Q    Okay.  And when did you become a K-9 officer?

4       A    Almost five years ago.  Actually it is five

5   years ago.

6       Q    Okay.  And were you trained or were you told

7   during your training that if somebody did not obey your

8   command that they could be arrested for resisting an

9   officer without violence?

10          MR. MOORE:  Object to form.  You can answer.

11          THE WITNESS:  While I was conducting -- while

12      you are conducting a lawful business, yes.

13  BY MR. LAURENT:

14      Q    Okay.  While you are conducting a lawful

15  business, what do you mean by that?

16      A    I was conducting a search for a suspect.  I

17  saw somebody riding a bicycle.  Two people, although it

18  wasn't just one.

19          He looked to be a white Hispanic male.  And

20  he was riding towards us.  It was dark out.  I told him

21  to stop.  He wouldn't stop.  I told him to stop again.

22          I lit him up with -- I lit myself up with the

23  flashlight, so he can clearly see that I was the

24  police.

25          He continued to ride.  He tried to ride past

1   -- I had to step to the side so that he wouldn't hit

2   me.  And I pulled him off the bike.

3        Q    But you don't know for certain that he knew

4   that you were a law enforcement officer?

5        A    I don't know what he thought.

6        Q    And you said it was a dark area where he was

7   traveling?

8        A    Well, Joshua said he knew we were the police

9   and he stopped.

10       Q    Okay.

11       A    And he was with him.

12       Q    And where was Joshua at?

13       A    He was right alongside him.

14       Q    He was alongside of him?

15       A    Yes.

16       Q    Is that where you state Joshua was at --

17   Joshua was at in your report?

18       A    Joshua was riding a bicycle side-by-side with

19   him.  At some point when Joshua realized that we were

20   the police Joshua stopped.  Montanez continued to ride

21   his bicycle.

22       Q    Okay.  But you don't know for certain if

23   Montanez knew you were a law enforcement officer?

24       A    I don't know what he thought or what he saw.

25       Q    Okay.  And going back to the description, can

15

1   you tell me what the victim told you the suspect had

2   on?

3       A    Going back to my affidavit that I wrote she

4   said a white shirt with dark pants.

5       Q    Okay.  And dark pants, does that mean long

6   sleeved pants?  I mean, not long sleeved, does that

7   mean full length pants?

8       A    I don't know --

9            MR. MOORE:  Object to form.  You can answer.

10           THE WITNESS:  I don't know what dark long

11      pants means to people nowadays.  Is it to the

12      knees, to the calf, to the ankles?

13           MR. LAURENT:  Okay.

14           THE WITNESS:  It varies.

15  BY MR. LAURENT:

16      Q    Did you ask the victim if he had on shorts or

17  if he had on pants?

18      A    I wrote down what she told me.

19      Q    Okay.  And do you recall what Mr. Montanez

20  had on?

21      A    He had on -- I think he had on pants.

22           [Examining]  I don't know what he had on.  So

23  I don't know if it was pants or shorts.  I don't know.

24      Q    Does it state in your report?

25      A    I'm looking through it.  It's very small

16

1  print.  [Examining]  Doesn't say.

2      Q    And does it state what color shirt he had on

3  in your report?

4      A    I didn't see a specific color shirt for him

5  either.

6      Q    It's in there towards the bottom.

7      A    Let's see.  [Examining]  I see it.

8          It says:  Isaiah was wearing a white shirt

9          and appeared to be between 18 and 22 years of age.

10      Q    And you testified earlier that he had on a

11  gray shirt with white stripes?

12      A    It was a -- I think it was actually a tank

13  top.

14      Q    Okay.  It was what color -- what color was

15  the tank top?

16      A    I think it was gray and white.

17      Q    Okay.

18      A    Striped.

19      Q    In your report, you didn't put that the shirt

20  he had on was gray and white?

21      A    I don't know --

22      MR. MOORE:  Object --

23      THE WITNESS:  -- why --

24      MR. MOORE:  Object to form.  You can answer.

25      THE WITNESS:  I don't know why I wrote white.

1    White's what stuck out when you shine the

2    flashlight.

3    BY MR. LAURENT:

4        Q    And today you remember it being gray and

5    white?

6        A    It looked like it was a gray and white shirt.

7    Striped.

8        Q    Was that a yes?

9        A    Yes.

10       Q    Okay.  And was Mr. Montanez searched after he

11   was arrested?

12       A    He was.

13       Q    And was he taken to the hospital?

14       A    He was.

15       Q    And who took him to the hospital?

16       A    I do not know.

17       Q    Did emergency personnel arrive on the scene?

18       A    Yes.

19       Q    And who called them?

20       A    I did.

21       Q    And did you go to the hospital to question

22   him at all after that?

23       A    No.

24       Q    And do you know if he was taken to the Orange

25   County Jail?

1      A     I don't know.  I didn't take -- if he was, I

2  didn't take him.  He should have been.

3      Q     Okay.  And you said he should have been, so

4  he was placed under arrest by you?

5      A     Yes.

6      Q     Now, earlier you stated that you were holding

7  your dog and you grabbed Mr. Montanez and you kind of

8  lifted up on your dog to prevent him from attacking Mr.

9  Montanez.

10         MR. MOORE:  Object to the form.  You can

11      answer.

12         MR. LAURENT:  Is that correct?

13         THE WITNESS:  My dog doesn't attack.

14  BY MR. LAURENT:

15      Q     Okay.  So you didn't state earlier that you

16  lifted him up to prevent him from biting Mr. Montanez?

17         MR. MOORE:  Object to form.  You can answer.

18         THE WITNESS:  That is correct.  I had lifted

19      -- pulled him up off the ground, so that he

20      wouldn't bite him.

21  BY MR. LAURENT:

22      Q     Okay.  And you stated that after you took Mr.

23  Montanez to the ground off of the bike and were on top

24  of him, that "Joker" bit him anyway?

25         MR. MOORE:  Object to form.  You can answer.

1    THE WITNESS:  "Joker" bit him because the

2  dogs are trained to react and protect the handler.

3  The dog sees it as I'm in a fight with somebody

4  and he's going to bite whatever I'm touching.

5  BY MR. LAURENT:

6    Q    Okay.  So the dog is trained to attack even

7  if you're not actually in a fight with somebody?

8    MR. MOORE:  Object to form.  You can answer.

9    THE WITNESS:  The dog is trained to defend

10  me.

11  BY MR. LAURENT:

12    Q    Okay.  But Mr. Montanez wasn't attacking you

13  at that time; correct?

14    A    The dog perceived it as a threat because we

15  were fighting on the ground.

16    Q    Okay.  So you and Mr. Montanez were fighting

17  on the ground?

18    A    Struggling to get him handcuffed.

19    Q    Okay.  Was he resisting at that time?

20    A    He became compliant pretty quickly.  **When** I

21  told him to put his hands behind back, put his hands

22  behind his back, he did.

23    Q    Okay.  So he didn't physically resist you at

24  all --

25    MR. MOORE:  Object --

1   MR. LAURENT:  -- on the ground?

2   MR. MOORE:  -- to form.  You can answer.

3   THE WITNESS:  He physically resisted by

4   trying to ride through us when we stepped to the

5   side.  And then I grabbed him and we fell to the

6   ground.

7   Once we were on the ground, and it happened

8   extremely fast, the dog bit him on the shoulder.

9   And I'm sure he felt it and he complied

10  immediately.

11  BY MR. LAURENT:

12  Q    At any time when you grabbed Mr. Montanez --

13  well, strike that.

14  Once you grabbed Mr. Montanez, did you not

15  have any control over him?

16  A    Control over who?

17  Q    Mr. Montanez?

18  A    I had him with one arm and I had the dog with

19  the other arm.

20  Q    Okay.  But did you have him under control,

21  Mr. Montanez?

22  A    Along with the other officer that was there

23  with me, yes.

24  Q    Okay.  And is -- how many people have -- has

25  "Joker" bitten while under your control?

1          MR. MOORE:  Object to form.  You can answer.

2          THE WITNESS:  I don't know the answer to that

3     question.  I don't have that information with me.

4  BY MR. LAURENT:

5     Q    Okay.  Is it more than ten?

6     A    I honestly don't know.

7     Q    You don't.  Is it less than ten?

8     A    It's -- I can't give you a number.  I'd have

9  to actually look at it.  I don't know.

10     Q    Okay.  Do you recall if anyone that "Joker"

11  bit -- well, strike that.

12          Do you recall not arresting someone that

13  "Joker" has bitten?

14          MR. MOORE:  Object to form.  You can answer.

15          THE WITNESS:  Repeat the question, please.

16  BY MR. LAURENT:

17     Q    Do you recall not placing someone under

18  arrest after "Joker" has bitten them?

19          MR. MOORE:  Same objection but you can

20     answer.

21          THE WITNESS:  No.

22  BY MR. LAURENT:

23     Q    So everyone that "Joker" has bitten, you have

24  placed under arrest?

25     A    I would have to say yes.

1     Q    And how long have you been "Joker's" handler?

2     A    I think three years, three-and-a-half years.

3     Q    And is "Joker" still with you?

4     A    No.   He's deceased.

5     Q    Okay.   Did he pass due to some illness or

6  anything?

7     A    He had medical problems.

8     Q    Okay.   And has an injunction ever been filed

9  against you?

10     MR. MOORE:  Objection to form.   Predicate.

11  Are you talking about -- well, you can answer if

12  you know.

13     THE WITNESS:  As far as I know, no.

14  BY MR. LAURENT:

15     Q    Okay.   And have you ever been arrested?

16     A    No.

17     Q    Have you been the subject of a criminal

18  investigation?

19     A    No.   Well, technically, yes.

20     Q    Other than making arrests?

21     A    Use of deadly force.

22     Q    Okay.

23     MR. MOORE:  That would have been an FDLE

24  investigation?

25     THE WITNESS:  Correct.

BY MR. LAURENT:

Q    And what were the results of that investigation?

A    I was exonerated.

Q    Have you ever been investigated by Internal Affairs?

MR. MOORE:  Object to the form.  You can answer.

THE WITNESS:  When I last checked, no.

BY MR. LAURENT:

Q    Okay.  Have you ever been reprimanded while working for the Orlando Police Department?

A    Oh, God.  You'd have to go back probably 10, 15 years for missing a training day.  Oral reprimand.

Q    And that's the only reprimand that you have received?

A    Yes.

Q    And was the result of that reprimand?

A    It was an oral reprimand and they just say don't do it again.

Q    Okay.  Based on your training and experience, can a person resist your arrest if you don't have probable cause to arrest him?

MR. MOORE:  Objection.  Predicate.  You can answer.

1           THE WITNESS:  I can -- repeat the question,

2     please.

3  BY MR. LAURENT:

4      Q    Based on your training and experience, can a

5  person resist an arrest if you don't have probable

6  cause to arrest him?

7           MR. MOORE:  Objection.  Predicate.  You can

8     answer.

9           THE WITNESS:  You're going to have reasonable

10    suspicion that they've committed a crime.

11  BY MR. LAURENT:

12      Q    Okay.  So if you have reasonable suspicion --

13  reasonable suspicion that they've committed a crime,

14  you can arrest them?

15           MR. MOORE:  Object to form.

16           MR. LAURENT:  Oh, I'm sorry.

17           MR. MOORE:  Yeah.

18  BY MR. LAURENT:

19      Q    If you have reasonable suspicion that they

20  have committed a crime, they cannot resist your arrest?

21           MR. MOORE:  Objection to form.  You can

22     answer.

23           THE WITNESS:  They can't resist, legally

24     resist, but they can, I mean, they can do what

25     they want, but they can't resist --

1       MR. LAURENT:   Okay.

2       THE WITNESS:   -- or obstruct.

3   BY MR. LAURENT:

4       Q    If you have reasonable suspicion that they've

5   committed a crime?

6       A    Yes.

7       Q    Okay.  But if you don't have reasonable

8   suspicion that they've committed a crime, can they

9   resist your arrest?

10      A    If you don't reasonable.  Repeat the

11  question.  You're --

12      Q    If you don't have reasonable suspicion that

13  they've committed a crime, can they lawfully resist

14  your arrest based on your training and experience?

15      MR. MOORE:   Object to form.  Predicate.  You

16      can answer.

17      THE WITNESS:   They can still not lawfully

18      resist but they can just do the best they can to

19      comply.

20  BY MR. LAURENT:

21      Q    Okay.  So they're not allowed to lawfully

22  resist?

23      A    By offering violence.  I mean, you're leaving

24  an open-ended question and I don't --

25      Q    Okay.

1       A      -- get it.

2       Q      Let's try this a different way.  If you don't

3   have reasonable suspicion to arrest somebody --

4       A      You need probable cause to arrest somebody.

5       Q      Well, I take that back.  If you don't have

6   reasonable suspicion to detain somebody, can that

7   person resist your arrest without violence?

8            MR. MOORE:  Object to form.  Predicate.  You

9        can answer.

10           THE WITNESS:  Yes.

11  BY MR. LAURENT:

12      Q      Okay.  They can?

13      A      You're confusing me.  Repeat the question.

14      Q      I'm not trying to but --

15      A      I know.  You're asking it in different ways

16  and --

17      Q      Yeah.

18      A      -- it's --

19      Q      Okay.  If you don't have reasonable suspicion

20  to detain someone, okay, can that person lawfully

21  resist your arrest as long as it's without violence?

22           MR. MOORE:  Objection.  Form.  Predicate.

23        You can answer.

24           THE WITNESS:  If have no reason to detain the

25        person with reasonable suspicion he wouldn't be

1    under arrest.

2         MR. LAURENT:  Okay.

3         THE WITNESS:  I wouldn't even bother with it.

4    BY MR. LAURENT:

5    Q    But if you did, can that person resist arrest

6    without violence legally?

7    A    I don't know.  I'm not an attorney.

8    Q    Okay.

9    A    I didn't --

10   Q    But I'm asking you based on your training and

11   experience?

12        MR. MOORE:  Well, asked and answered, but you

13        can answer again.

14        THE WITNESS:  No.

15   BY MR. LAURENT:

16   Q    They can't.  If you do not have probable

17   cause to arrest someone, can that person lawfully

18   resist your arrest without violence?

19   A    If you do not have probable cause?

20   Q    Yes.

21   A    Well, it's an unlawful arrest you shouldn't

22   be doing it.  But I wouldn't -- if I have no probable

23   cause to arrest somebody I am not going to arrest

24   somebody.

25   Q    Okay.  But can that person lawfully resist

28

1     arrest as long as it's without violence?

2               MR. MOORE:  Object to form.  You can answer.

3               THE WITNESS:  I would say no.

4   BY MR. LAURENT:

5      Q   No.  And that's based on your training and

6   experience; correct?

7      A    Yes.

8      Q    [Examining]  Have you received any training

9   how to remove someone from a moving bicycle?

10     A    No.

11     Q    No training at all?

12     A    No.

13     Q    Okay.  And have you seen Mr. Montanez since

14   you arrested him?

15     A    No.

16     Q    And did you know that the State declined to

17   file charges against Mr. Montanez?

18     A    I was aware of that.

19     Q    You were aware of that?

20     A    Yes.

21     Q    Okay.  [Examining]  Do you know where Mr.

22   Montanez was taken after he was arrested?

23     A    To the hospital and then to the jail.

24     Q    And did you look at Mr. Montanez'

25   injuries --

1    A    I --

2    Q    -- before he was taken to the hospital?

3    A    Yes.  I did.

4    Q    And what did you observe?

5    A    I saw some abrasions, like, scuff marks on

6  his shoulder.  It looked his knee and some puncture

7  wounds.

8    Q    Okay.  How many puncture wounds did you see?

9    A    I only saw the two.  I mean, I didn't roll

10  him over and -- because he was in handcuffs.  I let the

11  fire department deal with him.

12    Q    And after he was placed in handcuffs, was he

13  compliant while in your custody?

14    A    He was.

15    Q    Okay.  And have you ever had any other civil

16  suits filed against you since being with the Orlando

17  Police Department?

18    A    Yes.

19    Q    Okay.  Did those suits involve civil rights

20  violations?

21    A    That was awhile ago.  I'm not exactly sure.

22  Well, yeah, they did.

23    Q    Okay.  And do you know how long ago that was?

24    A    Probably the last six, seven years maybe.

25    Q    Okay.  And has it only been one?

1  A   Yes.

2  Q   And do you know what the results were of that

3  case?

4  A   They did send me the results but I don't

5  know.

6  Q   Okay.  And what's your current position at

7  the Orlando Police Department?

8  A   I'm a K-9 supervisor.

9  Q   Okay.  And how long have you held that

10  position?

11  A   Five years now.

12  Q   Okay.  [Examining]  And was Mr. Montanez

13  searched at the scene?

14  A   He was but not by me.

15  Q   Who searched Mr. Montanez?

16  A   I don't know.

17  Q   Do you recall how many police officers

18  arrived on scene?

19  A   Well, initially Officer --

20  MR. MOORE:  I'm going to object to the form

21  of that, but you can answer.

22  THE WITNESS:  Initially Officer Turner was

23  with me when --

24  MR. LAURENT:  Okay.

25  THE WITNESS:  -- this initially occurred.

1    And he actually took physical control over Mr.

2    Montanez.  When -- and then I moved -- removed the

3    dog from the area.

4  BY MR. LAURENT:

5    Q    And other officers arrived on the scene?

6    A    A few minutes later, yes.

7    Q    Okay.  And you said you're currently a K-9

8  supervisor?

9    A    That is correct.

10   Q    All right.  And we briefly talked about when

11 dogs, you know, are trained to attack, as far as, when

12 they believe you're being attacked earlier.

13       Do you guys train the dogs to not attack once

14 you gain custody of a suspect?

15   A    Again, the dogs don't attack.  They defend

16 us.

17   Q    Okay.

18   A    When we gain control of a suspect -- let's

19 say the dog is biting a person and the person complies,

20 they put their hands behind their back and they get

21 handcuffed.

22   Q    Okay.

23   A    The dog is told to release the bite.  The dog

24 releases the bite.  And either we will handcuff the

25 person or our -- what we call a cover officer will

1  handcuff the person.

2      Q    Is the dog trained to attack if you make any

3  movements on a suspect?

4      A    If we make movements on a suspect?

5      Q    Yes.

6      A    The dog is not going to do anything until we

7  tell him to.

8      Q    Okay.

9      A    Minus what he perceives as a threat or a

10  threat to me.

11      Q    All right.  And but the night that you

12  arrested Mr. Montanez, the dog did attack or he did

13  defend you?

14      A    The dog defended me.

15      Q    Okay.  Even though you did not give him a

16  command?

17      A    Correct.

18      Q    Okay.  And did Mr. Montanez throw any punches

19  at you?

20      A    He was riding a bicycle; no.

21      Q    Okay.  And so basically once you gained

22  control of Mr. Montanez, he was compliant?

23      A    Correct.

24      Q    But the dog still defended you at that point?

25      A    No.  That was -- the dog bit him and then we

33

1    gained control over him and then the dog released.

2        Q    Okay.  But at the time the dog bit Mr.

3    Montanez, Mr. Montanez wasn't attacking you?

4        A    The dog perceived it as a physical threat to

5    me.  He bit him while we were on the ground.  He still

6    was not in handcuffs.

7        Q    Okay.  But I'm asking you, did he attack him?

8        A    Mr. Montanez?

9        Q    Yes.

10       A    I would have been hit had I not stepped to

11   the side by the bicycle.

12       Q    Okay.  But other than him riding his bike

13   towards you, he didn't physically attack you?

14       A    No.

15            MR. LAURENT:  Okay.  I don't have any further

16       questions.

17            MR. MOORE:  All right.  I just have a couple

18       of quick follow-ups.  And I think we've covered

19       most of this.  I want to make sure we got a clear

20       question and response.

21                      CROSS EXAMINATION

22   BY MR. MOORE:

23       Q    Did you command "Joker" to bite Mr. Montanez?

24       A    No.

25       Q    Did you command "Joker" to release the bite

34

1   on Mr. Montanez?

2       A    I did.

3       Q    Did he comply immediately?

4       A    Yes.

5       Q    Did you have probable cause to arrest Mr.

6   Montanez for resisting without violence?

7       A    Yes.

8       Q    Did Mr. Montanez meet the description of the

9   suspected burglar when you initially viewed him coming

10  down the path toward you?

11      A    It was a robbery suspect, but, yes.

12      Q    And that was based on the description that

13  you had received?

14      A    Yes.

15      Q    And you are in -- you are close enough in the

16  area that it would have been -- it would have made

17  sense for the suspected person to be in this area?

18      A    Yes.

19      Q    All right.  Your initial command to Mr.

20  Montanez wasn't, stop, you're under arrest?

21      A    No.

22      Q    Your intention for Mr. Montanez was to stop

23  so you could continue your investigation; correct?

24      A    Yes.

25      Q    Do you know what force was used by Officer

1  Turner?

2     A    What force was used by Officer Turner?

3     Q    Yeah.

4     A    I don't --

5     Q    If any?

6     A    -- know.

7          MR. MOORE:   Okay.   I don't have any other

8     questions.

9          MR. LAURENT:   I've got a few.

10              REDIRECT EXAMINATION

11  BY MR. LAURENT:

12    Q    Do you recall what the other gentleman that

13  was with Mr. Montanez looked like?

14    A    I know his name was Joshua.  He seemed like a

15  taller guy.  They were both on bicycles, so it was kind

16  of hard to judge their --

17    Q    Was he also a white Hispanic male?

18    A    He looked to have longer hair.

19    Q    Okay.  But your description of the suspect

20  was a white Hispanic male?

21    A    Yes.

22    Q    And did I don't recall -- well, do you recall

23  there being a description of his length of hair of him?

24    A    No.

25    Q    Okay.  And the only part of the description

1  that Mr. Montanez fit was the fact that he was a white

2  Hispanic male?

3          MR. MOORE:  Object to form.  You can answer.

4          THE WITNESS:  He was also wearing a white

5      striped shirt although there was gray in it.

6          MR. LAURENT:  Okay.

7          THE WITNESS:  And it was not a T-shirt it was

8      a tank top.

9  BY MR. LAURENT:

10      Q    Okay.  And your testimony is that it wasn't a

11  gray shirt?

12      A    I was not a gray -- well, gray and white --

13      Q    Okay.

14      A    -- striped shirt.

15      Q    All right.  And you don't recall what color

16  pants he had on?

17      A    No.

18      Q    All right.  And he wasn't walking or running?

19      A    You're referring to Mr. Montanez?

20      Q    Yes.  Mr. Montanez wasn't walking or running?

21      A    Correct.

22      Q    He was on a bicycle?

23      A    Correct.

24      Q    Which was also not similar to what the victim

25  had told you?

1          MR. MOORE:  Object to form.  You can answer.

2          THE WITNESS:  That's correct.

3  BY MR. LAURENT:

4     Q   And do you still patrol that area?

5     A   The -- well, that Cady Way Trail is part of

6  the City of Orlando/Orange County jurisdiction, so it

7  kind of splits.  I don't go through there very often.

8     Q   Okay.  At that time, when this arrest

9  occurred back on March 31st, 2013, did you -- were you

10  assigned to that area?

11     A   We're not -- as a K-9 officer or a K-9 unit,

12  you're not assigned to a specific area.

13     Q   No.  Are you familiar with the area?

14     A   I am, yeah, a little familiar with it.

15     Q   Okay.  Is there a lot of Hispanics that live

16  in that area?

17          MR. MOORE:  Object to form.  You can answer.

18          THE WITNESS:  I couldn't tell you because I

19    do not encounter a lot of people over there.

20  BY MR. LAURENT:

21     Q   Okay.  And you stated that the area in which

22  you guys were was very dark.

23     A   It was.

24     Q   And you had to light yourself up.

25     A   Correct.

1   Q    But you could see Mr. Montanez clearly?

2   A    Way down the road there's a large light.  If

3   you're familiar with the term backdrop, backlighting,

4   basically what you see are shadows coming down the

5   street.

6        There was a bright white light behind them.

7   The road itself is not lit up.  But when they come

8   across that beam of light, you could see them.  You

9   can't see, you know, who it is or what they're wearing

10  but you can see figures.

11       And as they're getting closer and closer now

12  they're getting further and further away from that

13  light it's harder to see.

14       It was very dark where we were.  There was no

15  question about it.

16  Q    Okay.  And so you said that as they get

17  closer to you and away from the light, it becomes more

18  difficult for you to see them?

19  A    You could still see them --

20  Q    Yeah.

21  A    -- but it does become difficult.

22  Q    And you said even back when they're further

23  by the light, you can't see what they have on?

24  A    Correct.

25       MR. LAURENT:  Okay.  I've got no further

1  questions.

2       MR. MOORE:  All right.  Now, do you want to

3  read or waive?

4       THE WITNESS:  Read.

5       MR. MOORE:  Okay.

6       THE REPORTER:  Through you or --

7       MR. MOORE:  Yeah.  You can go through me.

8       THE REPORTER:  Thank you.

9       [Whereupon, the reading and signing of the

10  deposition was reserved.]

11       [Whereupon, the foregoing deposition was

12  concluded at 1:44 p.m.]

13                        - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF FLORIDA:

COUNTY OF SEMINOLE:

     I, Lorenda Kay Williams, Electronic Reporter Notary Public, State of Florida at Large, do hereby certify that I reported the deposition of JAMES PARKER and that the said witness was first duly sworn by me.

     I further certify that the foregoing pages numbered 3 through 39, inclusive, constitute a true, complete and accurate transcript of said witness to the best of my skill and ability.

     I further certify that I am not of counsel for, nor related to any party herein or attorney involved herein, nor am I financially interested in the outcome of this action.

     WITNESS MY HAND AND OFFICIAL SEAL this 4th day of August 2015.



LORENDA KAY WILLIAMS,
Marge Raeder Court Reporter, Inc.
Electronic Reporter and Notary
Public, State of Florida at Large.

LORENDA KAY WILLIAMS
MY COMMISSION # FF 005214
EXPIRES: April 19, 2017
Bonded Thru Budget Notary Services

Marge Raeder Court Reporter, Inc.
999 Douglas Ave/Suite 3307
Altamonte Springs, FL 32714
407/774-6611

1  <u>SUBSCRIPTION OF DEPONENT</u>

2      I, JAMES PARKER, have read the foregoing

3  deposition given by me on November 4, 2014, in

4  Altamonte Springs, Florida, and the following

5  corrections, if any, should be made in the

6  transcript.

7  <u>PAGE</u>    <u>LINE</u>    <u>CORRECTION AND REASON</u>

8

9      [Witness will be reading Mr. Moore's

10      copy of the deposition.]

11

12

13

14

15      Subject to the above corrections, if any, my

16  testimony reads as given by me in the foregoing

17  deposition.

18      SIGNED this _____ day of _____

19  2015.

20

21               _____

22               JAMES PARKER

23  Isaiah Montanez vs The City of Orlando

24  Case No. 6:14-cv-622-ACC-TBS
[Read thru Mr. Moore]

25